**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

JAMES O. MOORE

       *Plaintiff*,

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

       *Defendant*.

_____/

CASE NO. 19-12753

HON. TERRENCE G. BERG
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 19, 21)</u>

## I.   <u>RECOMMENDATION</u>

Plaintiff James Moore challenges Defendant Commissioner of Social Security's final decision denying his claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Supplemental Security Income benefits ("SSI"). The case was referred to me for review. (ECF No. 5); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's motion for summary judgment, (ECF No. 19), **GRANTING** the Commissioner's motion, (ECF No. 21), and **AFFIRMING** the Commissioner's final decision.

## II.   **REPORT**

### A.   **Introduction and Procedural History**

Plaintiff's disability case has a lengthy record. Plaintiff applied for DIB on February 10, 2009. (ECF No. 15-6, PageID.328.) He alleged he became disabled on November 17, 2007. (*Id.*) The Commissioner denied his claim. (ECF No. 15-4, PageID.205–09.) Plaintiff requested a hearing before an administrative law judge ("ALJ"), which occurred on January 10, 2011. (ECF No. 15-2, PageID.128–50.) The ALJ issued a decision on February 25, 2011, finding that Plaintiff was not disabled. (ECF No.15-3, PageID.184–94.) The Appeals Council remanded the case to an ALJ on November 1, 2011. (*Id.* at PageID.199–202.) A second hearing before a new ALJ occurred on July 27, 2012. (ECF No. 15-2, PageID.151–80.) The second ALJ issued a decision on August 31, 2012, finding that Plaintiff was not disabled. (*Id.* at PageID.99–113.) The Appeals Council denied review on May 24, 2013. (*Id.* at PageID.76–78.) Plaintiff sought judicial review, and on September 25, 2015, the U.S. District Court ordered the Commissioner's decision be reversed and remanded for further factual findings under sentence four of 42 U.S.C. § 405(g). (ECF No. 15-11, PageID.723–32.) On December 8, 2015, the Appeals Council referred the case to an ALJ. (*Id.* at PageID.733–34.) A hearing before the second ALJ occurred on June 20, 2016 (ECF No. 15-23, PageID.1524–44), and on June 29, 2016, he issued an unfavorable decision[1] finding that Plaintiff was not disabled. (ECF No. 15-22, PageID.1454–72.) The next record

---

[1] The ALJ stated that Plaintiff "filed subsequent claims for Title II and Title XVI disability benefits on April 8, 2014. The Appeals Council's action with respect to the present claim renders the subsequent claims duplicate, and I have consolidated the claim files." (ECF No. 15-22, PageID.1457.) However, the record reflects Plaintiff applied for SSI on July 22, 2014, and alleged he became disabled on February 26, 2011. (ECF No. 15-14, PageID.974–78.)

showed that Plaintiff sought judicial review and that the U.S. District Court reversed the Commissioner's decision and remanded the case under sentence four of 42 U.S.C. § 405(g). (ECF No. 15-22, PageID.1482–97.) On April 20, 2018, the Appeals Council remanded the case to an ALJ. (*Id.* at PageID.1498–1500.) At this point, the affirmation and order of the Appeals Council notes that Plaintiff filed for Title XVI SSI benefits on September 8, 2016, and as of May 26, 2017, the state agency issued a favorable determination of Plaintiff's disability. (*Id.* at PageID.1500.) The remaining matter to be adjudicated is Plaintiff's disability prior to September 8, 2016. (*Id.*) The ALJ held a hearing on April 17, 2019 (ECF No. 16-2, PageID.1706–55), and on May 24, 2019, a decision was made that Plaintiff was not disabled between November 17, 2007 and September 7, 2016. (ECF No. 15-21, PageID.1406–42.) Plaintiff sought judicial review for the instant case on September 20, 2019. (ECF No. 1.) The parties have filed their cross-motions for summary judgment and briefing is complete. (ECF Nos. 19, 21, 24.)

## B.     Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . .

3

It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id*. at 286. (internal citations omitted).

### C.    Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.

> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.

4

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.

(iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.

(v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

5

### D.    ALJ Findings

Following the five-step sequential analysis, the ALJ determined that Plaintiff was

not disabled from November 17, 2007, the alleged onset date, through September 7, 2016.

(ECF No. 15-21, PageID.1442.) At step one, the ALJ found Plaintiff last met the insured

status requirements on December 31, 2012. (*Id.* at PageID.1416.) Plaintiff had not engaged

in substantial gainful activity from the alleged onset date through September 7, 2016. (*Id.*)

At step two, the ALJ concluded that Plaintiff's severe impairments were

- myofascial trauma with bilateral frontal sinus fractures,
- bilateral maxillary and orbital fractures (from a motor vehicle accident in 2007),
- degenerative disc disease with L5 pars defect with Grade I-II anterolisthesis,
- cervicalgia with a history of cervical fusion (2003),
- right knee chondrocalcinosis status post arthroscopic repair,
- thoracic fracture,
- obesity, and
- depression.

(*Id.*) The ALJ found that Plaintiff had non-severe impairments of plantar fasciitis, plantar

calcaneal spurring, a small hiatal hernia, gastroesophageal reflux disease, spina bifida, and

headache. (*Id.* at PageID.1416–17.) These impairments did not meet or medically equal a

listed impairment at step three. (*Id.* at PageID.1417–18.) Next, the ALJ found that Plaintiff

had the residual functional capacity ("RFC"), from November 17, 2007 to September 7,

2016,

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b)
> except for the following: [Plaintiff] was capable of frequent balancing. He
> was capable of frequent rotation and flexion of the neck. [Plaintiff] was
> capable of occasionally climbing ramps, stairs, ladders, ropes, and scaffolds.
> He was capable of occasionally stooping, kneeling, crouching, and crawling.
> [Plaintiff] was limited to simple and routine tasks.

(*Id.* at PageID.1420.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.1437.) Finally, at step five, the ALJ determined Plaintiff could have performed a significant number of jobs in the national economy. (*Id.* at PageID.1438.) This included power screwdriver operator, marker II, and small parts assembler I. (*Id.*) Accordingly, Plaintiff was found to be not disabled. (*Id.* at PageID.1442.)

### E.    Administrative Record

#### 1.    Overview of Medical Evidence

##### a.    Treatment Notes

In November 2007, Plaintiff underwent facial surgery for fractures suffered following a motor vehicle accident. (ECF No. 15-8, PageID.442–43.) Plaintiff was discharged in stable condition with prescribed Percocet medication for pain. (*Id.* at PageID.444.) CT scans showed no acute abdominal process, a possible L5 deformity, and small hepatic cyst and hiatal hernia. (*Id.* at PageID.431, 439.) A medical record notes Plaintiff's history of anterior cervical fusion of C6/C7 and a history of knee surgery. (*Id.* at PageID.429.) CT scans at this time showed no evidence of cervical spine fracture, no evidence of hip fracture, grade II anterolisthesis of L5 on S1, no evidence of intracranial hemorrhage nor midline shift, evidence of multiple facial fractures, no evidence of fracture in the right arm, and no evidence of pelvic fracture. (*Id.* at PageID.412–18.) A chest x-ray was unremarkable, and other records noted facial fractures. (*Id.* at PageID.404.)

Plaintiff presented to Dr. Lewandowski of Neuropsychology Associates. (*Id.* at PageID.452–57.) Plaintiff's symptoms included impaired attention, difficulties with sustained concentration, impaired short-term memory, cognitive organization, and periods

of confusion, visual difficulties, pain, discomfort, and dizziness. (*Id.* at PageID.452.) On examination, the doctor observed Plaintiff's posture as restless due to discomfort and pain. (*Id.* at PageID.455.) Plaintiff's gait was slowed due to injuries. (*Id.*) Plaintiff had no speaking issues and showed normal behavioral traits, though he was somewhat reserved. (*Id.*) Plaintiff's mood reflected depression, irritability, and anxiety. (*Id.* at PageID.456.) Plaintiff was alert to person, place, time, and purpose. (*Id.*) There were mild limitations to simple attention and sustained concentration. (*Id.*) Plaintiff's judgment and reasoning were intact, and his insight was good. (*Id.*) Plaintiff's ability to recall objects declined after delay. (*Id.*) Dr. Lewandowski assessed that Plaintiff had a closed head injury/traumatic brain injury. (*Id.* at PageID.457.) Plaintiff's plan noted significant acute cognitive decline due to the motor vehicle accident, and further diagnostic study was needed to clarify Plaintiff's mental status. (*Id.*)

In January 2008, an MRI of Plaintiff's cervical spine showed postsurgical changes in the C5–C7 vertebrae, ample decompression of the spinal canal, no neural compromise, mild to moderate right foraminal stenosis without compromise of the nerve root or spinal canal. (*Id.* at PageID.447.)

In August 2008, a SPECT scan showed signal evidence suggesting degenerative disc disease, no abnormal activity within the ribs, and probable mild degenerative changes within the shoulders, knees, and feet bilaterally. (*Id.* at PageID.491.) X-rays of Plaintiff's cervical spine showed no fracture and satisfactory alignment; of Plaintiff's sternum showed mild degenerative irregularity and no fracture; and of Plaintiff's thoracic spine showed mild scoliosis and moderate degenerative changes. (*Id.* at PageID.492–94.)

In September 2008, Plaintiff was considered for cervical facet joint block by Dr. Steven Silverman. (*Id.* at PageID.489.) Plaintiff reported pain in the right base of the skull that radiated into the head and down to the right shoulder. (*Id.*) He also reported that physical therapy did not help. (*Id.*) An MRI showed a right C3–4 degenerative disc and right-sided foraminal stenosis. (*Id.*) Plaintiff's physical exam showed he was alert, oriented, and in no apparent distress. (*Id.*) His deep tendon reflexes were 1+. (*Id.*) His strength testing was 5/5. (*Id.*) There was pain on palpation over the right greater occipital nerve and over certain cervical facet joints. (*Id.* at PageID.490.) The recommendation was for a diagnostic block with a possibility for a more permanent cervical facet rhizolysis. (*Id.*) Plaintiff then underwent the facet block procedure in September 2008. (*Id.* at PageID.486.) Plaintiff also underwent an epidural steroid injection in October 2008. (*Id.* at PageID.485.) In November 2008, Plaintiff had an MRI of his thoracic spine that showed mild thoracic spondylosis with multiple minimal extradural defects, but no major neural encroachment in the thoracic spine. (*Id.* at PageID.483.) Plaintiff also underwent an intercostal nerve block at the right T7 and T8 level in January 2009. (*Id.* at PageID.484.)

Plaintiff engaged in physical therapy in July, August, November, and December 2008. (*Id.* at PageID.472–83.) Plaintiff reported no changes and only temporary relief. (*Id.* at PageID.472.) Later, Plaintiff's function, range of motion, and strength were all reported to be better. (*Id.* at PageID.478.)

Plaintiff received treatment from Rose City Family Practice. (ECF No. 15-8, PageID.496–99; ECF No. 15-9, PageID.547–54, 582–88; ECF No. 15-16, PageID.1101–09; ECF No. 15-17, PageID.1193–1202; ECF No.15-27, PageID.1695–1701.) Plaintiff's

chief complaints during these appointments included medication refills, GERD, back pain, depression, neck pain, and disability paperwork. (*Id.*)

Plaintiff had a number of appointments with Dr. Carrie Stewart of Ann Arbor Spine Center. (ECF No. 15-9, PageID.557–74; ECF No. 15-16, PageID.1052–62.) Plaintiff described pain in the mid-back and cervical spine as 8/10. (*Id.* at PageID.571.) Plaintiff reported that pain was alleviated with medication, lying down, and physical therapy. (*Id.* at PageID.559, 562, 564, 567, 572.) Plaintiff also reported medication and therapy ending as a result of an independent medical examiner recommending permanent work restriction. (*Id.* at PageID.562.) Plaintiff's physical examination showed he was alert and oriented and ambulated with a normal gait. (*See, e.g., id.* at PageID.572–73, 568, 564, 562, 559, 55; ECF No. 15-16, PageID.1055, 1059.) Plaintiff had tenderness on palpation to his cervical spine and the thoracolumbar junction. (ECF No. 15-9, PageID.573, 568, 564.) There was tenderness to palpation in the low lumbar spinous processes. (ECF No. 15-16, PageID.1059.) His paraspinal muscles were nontender. (ECF No. 15-9, PageID.573) Plaintiff had 5/5 muscle strength through all muscle groups, his deep tendon reflexes were 2+ in the patellar and Achilles tendons. (*Id.*) Plaintiff's cervical spine range of motion was limited by pain. (*Id.* at PageID.573, 564, 560; ECF No. 15-16, PageID.1055, 1060.) Plaintiff's lumbar spine range of motion was limited by pain. (ECF No. 15-9, PageID.557; ECF No.15-16, PageID.1055.) He had full muscle strength and 2+ deep tendon reflexes in his upper extremities. (*See, e.g.,* ECF No. 15-9, PageID.573, 568, 564, 560; ECF No. 15-16, PageID.1055.) Plaintiff showed slight straightening of the cervical spinal posture and his lumbar spinal posture was normal. (ECF No. 15-9, PageID.568.) Plaintiff had a

negative straight leg raise test. (*Id.* at PageID.560, 568.) Plaintiff's x-ray's showed radiographic evidence of acute versus chronic compression deformities at T8-T10 of the thoracic spine. (*Id.*) Also, there was grade 2 anterolisthesis of L5 on S1 and lumbar and cervical spondylosis. (*Id.*)

In July 2010, an MRI of Plaintiff's cervical spine showed multiple extradural defects, but further clinical correlation is necessary to determine Plaintiff's symptomatology. (*Id.* at PageID.576.) An MRI of Plaintiff's lumbar spine showed chronic mild anterior compression deformities, subtle small hyperintense lesions, and multilevel lumbar spondylosis. (*Id.* at PageID.578.)

In February 2011, Plaintiff reported to Dr. Stewart that he continued to have chronic pain, that took up to four Vicodin per day, that he saw a chiropractor, that he had not seen a physical therapist, that he experienced flare ups of increased pain, and that he felt better sitting and worse when standing. (ECF No. 15-16, PageID.1055.) In October 2011, Plaintiff reported an inability to sit, stand, or walk for too long and an inability for repetitive twisting and bending. (*Id.* at PageID.1059.) Plaintiff was frustrated with a lack of progress; he attended only a few physical therapy sessions, and he rarely exercised his back due to pain. (*Id.*)

Dr. Stewart noted Plaintiff tends to respond to things that are more passive, and she has encouraged him to go forward with a regular exercise program. (ECF No. 15-9, PageID.565.) She recommended Plaintiff contact a physical therapy clinic and to finalize a home exercise program. (*Id.* at PageID.560.) He should remain active and pursue a gym

membership. (*Id.*) Dr. Stewart had concerns about Plaintiff's anxiety and that he should look into stress management. (*Id.*)

Dr. Stewart prescribed physical therapy for Plaintiff's spinal condition. (*Id.* at PageID.558.) She also stressed regular exercise and wanted to have Plaintiff considered for chronic pain management. (*Id.*) She continued to recommend home exercises for Plaintiff, as well as medication and other remedies. (ECF No. 15-16, PageID.1056.) Later in October 2011, Dr. Stewart continued to recommend physical therapy and aerobic exercises, but also recommended that he be off-work initially and have a job that allowed changes in position frequently. (*Id.* at PageID.1060.)

In October 2013, Plaintiff began to receive services from Summit Pointe to address his depression. (ECF No. 15-17, PageID.1111–59; ECF No. 15-18, PageID.1204–1308; ECF No. 15-19, PageID.1310–17.) Plaintiff was described as appropriately dressed and well groomed; he had normal communication ability; his mood was unremarkable and cooperative; appropriate affect; normal behavior; unremarkable thought content; good memory and insight. (ECF No.15-17, PageID.1114–15.) With entry to Summit Pointe, Plaintiff was authorized for medication review and group therapy. (*Id.* at PageID.1121.) A mental status exam of Plaintiff in December 2013 indicated Plaintiff's complaints of pain, feeling exhausted, financial difficulties, memory fluctuations, and feelings of sadness and hopelessness. (*Id.* at PageID.1129.) It was noted that Plaintiff walked with expression of pain; he was engaging and had excellent interpersonal skills; he had normal intelligence; he had no delusions or hallucinations. (*Id.*) Plaintiff was considering medication. (*Id.*) Later, Plaintiff was found to have normal muscle strength, gait, speech, thought process,

judgment, orientation, fund of knowledge, recent/remote memory, attention span, and sleep. (*Id.* at PageID.1131. *See also* ECF No. 15-18, PageID.1244, 1247–48, 1250.) In April 2014, Plaintiff was noted to have abnormal mood, as sad, but was otherwise normal in thought process, judgment, and orientation. (*Id.* at PageID.1151, 1156.) Plaintiff reported difficulty sleeping and aching pain. (*Id.* at PageID.1151–52. *See also* ECF No. 15-18, PageID.1244, 1250)

In November 2013, Plaintiff began treatment with Health Specialists of Lenawee with Dr. Dennis Shelle. (ECF No. 15-19, PageID.1373–74.) Plaintiff was not in acute distress, he had a normal chest and lung exam, and he had tenderness on palpation of his thoracic spine. (*Id.*)

With Dr. Shelle, among Plaintiff's reported matters were an episode of numbness in his back (*id.* at PageID.1371), back problems with weather changes (*id.* at PageID.1367, 1343), chest pain (*id.* at PageID.1355), an injured right elbow (*id.* at PageID.1353) and needing stronger pain medication (*id.* at PageID.1351). Plaintiff's physical examinations were generally normal, including no distress in his general appearance, normal chest and lung exams, and normal cardiovascular and abdominal exams. (*Id.* at PageID.1334, 1336–37, 1338, 1340, 1341, 1343, 1345, 1347, 1349, 1351, 1353, 1355–56, 1358–59, 1360–61, 1362–63, 1365–66, 1367, 1369, 1371.) Plaintiff had tenderness in the thoracic spine. (*Id.* at PageID.1339, 1341, 1343, 1345, 1347, 1349, 1351, 1353, 1356, 1359, 1361, 1363, 1366, 1368, 1370, 1372, 1374.) Plaintiff had tenderness in the lumbosacral spine. (*Id.* at PageID.1339, 1341, 1343, 1345, 1347, 1349, 1351, 1353, 1356, 1359, 1361, 1363, 1368.) Plaintiff had a positive straight leg raise test. (*Id.* at PageID.1339, 1341, 1343, 1345, 1347,

1349, 1351, 1353, 1356, 1359, 1361, 1363, 1368.) His cervical spine range of motion was limited. (*Id.* at PageID.1334, 1337, 1339.)

In June 2014, a diagnostic image of Plaintiff's lumbar spine showed anterolisthesis L5 on S1 and likely secondary to spondylosis on L5. (ECF No. 15-19, PageID.1377.) Also, there was mild degenerative changes in the lumbar spine. (*Id.*) His thoracic spine image showed mild anterior wedging in the lower thoracic spine, mild degenerative disc disease, and degenerative spondylosis. (*Id.* at PageID.1378.) In June 2015, a diagnostic image of Plaintiff's right knee showed chondrocalcinosis, and it was negative for fracture. (*Id.* at PageID.1375.)

From August 2014 to April 2016, Plaintiff worked with a chiropractor. (ECF No. 15-19, PageID.1318–31.) Plaintiff had regular complaints of pain including thoracic pain, low back pain, neck pain, hip pain, and shoulder pain. (*Id.*)

In November 2014, following complaints of foot paint, an assessment of Plaintiff found that he had plantar fasciitis. (ECF No. 15-20, PageID.1388.)

### b.    Opinion Evidence

Dr. Malcheff recommended Plaintiff be excused from work between January 21, 2009 to February 2, 2009. (*Id.* at PageID.508–09.)

In June 2009, Dr. Tama Abel provided a consultative examination. (ECF No. 15-9, PageID.511–15.) Plaintiff reported back, neck and knee pain. (*Id.* at PageID.511.) Plaintiff took medication as needed for the pain. (*Id.*) Plaintiff reported severe headaches that occur four to five times per week. (*Id.*) Plaintiff's physical examination showed he could sit comfortably but with mild painful behavior through the efforts of the examination. (*Id.* at

14

PageID.512.) Plaintiff had full fist grip strength and dexterity. (*Id.*) Plaintiff had no difficulty with getting on/off the examination table, heel-to-toe walking, and squatting. (*Id.*) Plaintiff had neck, back, knee, and hamstring pain, but nevertheless had full range of motion in the spine, shoulders, elbows, hips, knees, ankles, wrists, hands, and fingers. (*Id.* at PageID.513–14.) The doctor concluded Plaintiff's back pain was musculoskeletal in origin, and there was no nerve root irritation. (*Id.* at PageID.515.) Plaintiff had a negative straight leg raise test. (*Id.*) Chronic pain management strategies were supported. (*Id.*)

In July 2009, Dr. Dennis Beshara evaluated Plaintiff's mental RFC. (*Id.* at PageID.529–46.) Plaintiff's medically determinable impairment was found to be depression. (*Id.* at PageID.536.) Plaintiff also had mild limitations in his activities of daily living and difficulties in maintaining social functioning. (*Id.* at PageID.543.) Plaintiff had a moderate difficulty in maintaining concentration, persistence, or pace. (*Id.*) Dr. Beshara's medical source statement stated Plaintiff's "injuries have been life altering. He is currently unable to sit, stand, walk or lay for any period of time without pain. It is going to be extremely difficult for him to maintain any type of employment at this time." (*Id.* at PageID.545.) Plaintiff was considered credible regarding his alleged symptoms and effects on functioning. (*Id.*) Further, Dr. Beshara stated Plaintiff's impairments could be reasonably expected to produce his symptom. (*Id.*)

Also, in July 2009, Dr. Russell Holmes evaluated Plaintiff's physical RFC. (*Id.* at PageID.521–28.) Plaintiff could occasionally lift or carry 50 pounds, and frequently lift or carry 25 pounds. (*Id.* at PageID.522.) Plaintiff could stand or walk or sit for six hours of an eight-hour workday. (*Id.*) Plaintiff could occasionally climb stairs or ladders, and

15

frequently balance, stoop, kneel, crouch, and crawl. (*Id.* at PageID.523.) Plaintiff had no manipulative or visual limitations. (*Id.* at PageID.524.) Plaintiff should avoid concentrated exposure to vibration and fumes, odors, or gases. (*Id.* at PageID.525.) Dr. Holmes stated Plaintiff's described symptoms and their stated intensity are somewhat consistent with the medical evidence. (*Id.* at PageID.526.)

Further in July 2009, Dr. Tim Strang performed a consultative examination. (ECF No. 15-9, PageID.516–20.) Plaintiff reported getting along with neighbors and having a support system with his friends. (*Id.* at PageID.517.) Plaintiff reported that his pain is worse with activity and that he has help from his sisters. (*Id.*) Plaintiff was observed to be polite, in some pain, and walking very slowly at the appointment. (*Id.*) Plaintiff's thoughts were well organized, and Plaintiff denied hallucinations or delusions. (*Id.* at PageID.518.) Plaintiff had a diagnosis of depression and a GAF score of 55. (*Id.*) Plaintiff's prognosis stated Plaintiff's "injuries have been life altering. He is currently unable to sit, stand, walk or lay for any period of time without pain. It is going to be extremely difficult for him to maintain any type of employment at this time." (*Id.* at PageID.519.)

In September 2014, Plaintiff was examined by Dr. Samantha Wheeler for a consultative examination. (ECF No. 15-17, PageID.1160–66.) Plaintiff complained of the of the fractures, headaches, and nerve conditions following his 2007 auto accident. (*Id.* at PageID.1160.) Plaintiff added that he had arthritis in his back and plantar fasciitis. (*Id.*) Plaintiff was observed to have no motor difficulties and no difficulties with gait or posture. (*Id.* at PageID.1162.) Plaintiff's attitude, mental activity, and thought content were generally unremarkable; but Plaintiff's self-esteem appeared poor, and he presented a

depressed affect. (*Id.*) Dr. Wheeler's medical source statement was that "[Plaintiff] is able to understand, remember, and carry out simple instructions. He appears able to maintain attention and concentration." (*Id.* at PageID.1164.) She further stated Plaintiff's cognitive ability appears average and that he gets along with others. (*Id.*)

In October 2014, Dr. R. Scott Lazzara provided a consultative examination of Plaintiff. (*Id.* at PageID.1167–72.) Plaintiff complained of chronic headache and neck and back pain. (*Id.* at PageID.1167.) Plaintiff stated the neck pain radiated into his arms, and it was aggravated by coughing and sneezing. (*Id.*) He is on medication for pain management, and he occasionally used a back brace. (*Id.*) Plaintiff stated he had not worked since 2007. (*Id.*) He can occasionally do household chores or yardwork. (*Id.*) He could sit for an hour, stand for 15 minutes, walk about 300 yards, and lift up to 10 pounds. (*Id.*) Plaintiff's physical examination showed that Plaintiff was cooperative; his concentration and memory were intact; his insight and judgment were appropriate; and he appeared to be in mild discomfort and to be mildly depressed. (*Id.* at PageID.1168.) Plaintiff's eyes, ears, chest, abdomen, and vascular systems appeared unremarkable. (*Id.*) Plaintiff's musculoskeletal system showed cervical spine straightening and synovial thickening in his right knee. (*Id.* at PageID.1169.) Plaintiff grip strength and dexterity were intact. (*Id.*) Plaintiff had mild difficulty heel and toe walking, squatting, and standing on either foot. (*Id.*) Plaintiff had limitations of range of motion in his cervical and dorsolumbar spine and his right and left knees. (*Id.* at PageID.1169–70.) Plaintiff's neurological exam showed intact motor strength and normal muscle tone. (*Id.* at PageID.1171.) Dr. Lazzara concluded "At this point he does not appear to be actively declining but is at risk for further deterioration to the cervical

spine due to trauma." (*Id.*) He further noted Plaintiff had no history of seizure activity nor focal neurological deficits. (*Id.*) And given Plaintiff's complaints of depression, a neuropsychological evaluation may benefit Plaintiff. (*Id.*) Dr. Lazzara further provided a form that Plaintiff could perform a full range of postural and manipulative maneuvers. (*Id.* at PageID.1173.) There were noted limitations[2], however, for standing for four to six hours of an eight-hour day; for occasionally bending, stooping, and squatting; and carry and push less than 20 pounds. (*Id.*) Plaintiff had normal bilateral reflexes in the upper extremities and lower extremities, but he had decreased Babinski's sign bilaterally. (*Id.*) Plaintiff's straight leg raise test was within normal limits. (*Id.* at PageID.1174.) Plaintiff had mild difficulty walking on his heels and toes, and he walked with a wide-based gait. (*Id.*) Plaintiff did not need a walking aid. (*Id.*) Plaintiff's upper extremity strength was 5/5. (*Id.*)

In October 2014, state agency consultant Dr. Bruce Douglass evaluated Plaintiff's case. (ECF No. 15-11, PageID.751–64.) Plaintiff was found to have impairments of degenerative disc disease and affective disorders, both of which were severe. (*Id.* at PageID.757.) Plaintiff was found to have mild limitations on his activities of daily living, moderate limitations in difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at PageID.757–58.) Further, Plaintiff's case was evaluated where he had the following RFC. Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds. (*Id.* at PageID.759.) Plaintiff

---

[2] Plaintiff argues this form is unclear. There is no merit to that claim, as the comments within the chart are clearly, where relevant, "4–6 hours / 8 hour" or "occasionally" or "less than 20 pounds" or the 'ditto mark' that indicates that the item above it is repeated. This is not inconsistent with the rest of the record.

could sit, stand, or walk for six hours of an eight-hour workday. (*Id.*) Plaintiff could frequently climb stairs, ladders, balance, stoop, kneel, crouch, and crawl. (*Id.* at PageID.759–60.) Plaintiff had no manipulative limitations or environmental limitations. (*Id.* at PageID.760.) The determination that Plaintiff could perform light work was based on a decreased range of motion in the cervical and lumbar spine, decreased range of motion of both knees with some sensory loss of his right leg. (*Id.*) But Plaintiff retained his strength. (*Id.*) Further, Plaintiff had moderate limitations in his ability to carry out detailed instructions and maintain attention and concentration for extended periods of time. (*Id.* at PageID.761.) His ability to maintain a schedule and be punctual, or complete a normal workday, was moderately limited. (*Id.*) Plaintiff's ability to work appropriately with the public, accept criticism, and get along with peers was moderately limited. (*Id.* at PageID.761–62.) Plaintiff was found to be not disabled. (*Id.* at PageID.763.)

In May 2015, Dr. Dana Dewitt provided a medical source statement. (ECF No. 15-17, PageID.1175–79.) Dr. Dewitt indicated he saw Plaintiff every three months since 1998. (*Id.* at PageID.1175.) Plaintiff's diagnoses were spina bifida and chronic low back pain; his prognosis was poor. (*Id.*) Movement of the neck, back, and waist precipitated Plaintiff's severe neck and low-back pain. (*Id.*) The objective signs of Plaintiff's condition were the documented spina bifida and spinal degeneration. (*Id.*) Plaintiff's treatment included pain control but his function has not improved. (*Id.*) Plaintiff's experience of pain and other symptoms were likely to frequently interfere with his attention and concentration. (*Id.* at PageID.1176.) Plaintiff could walk for two blocks, sit for 20 minutes, and stand for five minutes. (*Id.*) In an eight-hour day, Plaintiff could sit, stand, or walk for about 2 hours. (*Id.*

at PageID.1177.) Plaintiff must walk every 60 minutes for five minutes each. (*Id.*) Plaintiff would require a job that permits shifting at will from sitting, standing, and walking. (*Id.*) Plaintiff will need unscheduled breaks in the workday. (*Id.*) Plaintiff could rarely lift less than 10 pounds, and never 10 pounds or more. (*Id.*) Plaintiff could rarely look down and occasionally look up or left/right. (*Id.* at PageID.1178.) Plaintiff could occasionally twist, occasionally stoop or crouch, and occasionally climb stairs. (*Id.*) Plaintiff could not use his hands, fingers or arms due to parestheias. (*Id.*) Plaintiff would likely be absent from work four days per month because of his condition. (*Id.*)

Also, in May 2015, Dr. Dennis Shelle provided a medical source statement. (*Id.* at PageID.1180–84.) He indicated he had seen Plaintiff quarterly since 2011. (*Id.* at PageID.1180.) He noted a poor prognosis for Plaintiff. (*Id.*) Plaintiff's symptoms were low and upper back pain and neck pain. (*Id.*) The objective sign of Plaintiff's condition was pain that was noted on examination. (*Id.*) Plaintiff was treated with medication and physical therapy. (*Id.*) Plaintiff's depression affected his physical condition. (*Id.* at PageID.1181.) Plaintiff's condition with his pain and other symptoms would frequently interfere with attention and concentration. (*Id.*) Plaintiff could walk two blocks, and at one time, he could sit for 20 minutes and stand for five minutes. (*Id.*) In an eight-hour day, Plaintiff could sit/stand/walk for about two hours. (*Id.* at PageID.1182.) Plaintiff would need periods of walking around during the workday. (*Id.*) He would also need unscheduled breaks and the ability to shift at will from standing to sitting. (*Id.*) Plaintiff could rarely lift less than 10 pounds, and never 10 pounds or more. (*Id.*) Plaintiff could never look down and rarely look left, right, or up. (*Id.* at PageID.1183.) Plaintiff could occasionally twist and climb stairs,

rarely stoop and crouch, and never climb ladders. (*Id.*) Plaintiff had no significant limitations in reaching, handling, and fingering. (*Id.*) Plaintiff was likely to miss more than four days of work per month. (*Id.*)

In June 2015, Dr. Robert Scott provided a medical source statement. (ECF No. 15-17, PageID.1185–89.) Dr. Scott stated he has been in contact with Plaintiff two times per month since August 2014. (*Id.* at PageID.1185.) He stated Plaintiff's symptoms as neck, thoracic, and lumbar pain and occasional bilateral arm numbness. (*Id.*) The clinical findings for Plaintiff included pain on palpation, neck fusion, and degenerative disc disease observed. (*Id.*) Plaintiff's treatment included chiropractic adjustments. (*Id.*) Plaintiff's condition was likely to frequently interfere with his attention and concentration. (*Id.* at PageID.1186.) Plaintiff could walk two city blocks without rest, and he can sit for 20 minutes and stand for 10 minutes at a time. (*Id.*) In an eight-hour workday, Plaintiff could sit/stand/walk for less than 2 hours. (*Id.* at PageID.1187.) Plaintiff needed the time to walk during the day and the ability to shift from sitting to standing at will. (*Id.*) Plaintiff would need unscheduled breaks of five minutes about every hour. (*Id.*) Plaintiff could rarely lift less than 10 pounds, and never lift 10 pounds or more. (*Id.*) Plaintiff could never look down or up, and rarely turn his head left or right. (*Id.* at PageID.1188.) Plaintiff could occasionally twist, crouch, and climb stairs; rarely stoop; and never climb ladders. (*Id.*) Plaintiff had no significant limitations with reaching, handling, or fingering. (*Id.*) Plaintiff would likely miss more than four days of work per month. (*Id.*)

In May 2017, Plaintiff was found to be disabled for the purposes of his SSI application. (ECF No. 15-22, PageID.1502–22.) The established alleged onset date of his disability was September 8, 2016. (*Id.* at PageID.1520.)

### 2.    Application Reports and Administrative Hearings

### a.    Function Report (2014)[3]

Plaintiff completed a function report on August 13, 2014. (ECF No 15-15, PageID.1033.) Plaintiff described how he could not work because severe pain, headaches, and depression. (*Id.* at PageID.1026.) The severe pain affected his abilities for standing, walking, sitting, bending, or twisting. (*Id.*) And he did not leave the house for multiple days. (*Id.*) He lives alone (id.), and his days typically included making meals, watching television, taking his medication, napping, going to doctor appointments, reading, visiting family or friends. (*Id.* at PageID.1027.) He did not take care of other people or animals. (*Id.*) His sleep was affected by pain in his back and neck, and he tosses and turns. (*Id.*) Before his current condition, he could work, golf, play softball, and repair cars. (*Id.*) He was okay with doing personal care with dressing, bathing, shaving, feeding himself; but he sometimes had back pain issues with using the toilet. (*Id.*) Plaintiff made simple meals of sandwiches and frozen dinners, and before his current condition, he could make complete meals. (*Id.* at PageID.1028.) Plaintiff described doing limited housework for cleaning and laundry and only when he must do the work. (*Id.*) He stated he was limited by his pain and depression. (*Id.* at PageID.1029.) Plaintiff could drive and go out alone. (*Id.*) He could shop

---

[3] Within the transcript is a function report from February 2009. (ECF No 15-7, PageID.376–83.) The responses are substantially identical to the 2014 function report.

for food and essential items in stores for two or three times per month. (*Id.*) Plaintiff could handle money. (*Id.*) His hobbies included watching television and reading. (*Id.* at PageID.1030.) He spent time with others about four times per week. (*Id.*) He needed reminders go places. (*Id.*) He had problems sometimes getting along with others because his pain made him frustrated or angry. (*Id.* at PageID.1031.)

Plaintiff claimed his condition affected his ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, see, remember, complete tasks, concentrate, and get along with others. (*Id.*) He could walk for 300 yards, and then rest for 10–15 minutes. (*Id.*) He could pay attention for about 40 minutes, and he could follow spoken or written instructions. (*Id.*) He could get along with authority figures. (*Id.* at PageID.1032.) He did not handle well stress or changes in routine. (*Id.*) He used a knee brace and glasses, which were prescribed in 1997 and seven years ago, respectively. (*Id.*)

Plaintiff took medication that caused side-effects of drowsiness and being detached or aloof. (*Id.* at PageID.1033.)

### b.     Plaintiff's Testimony at the Administrative Hearing

Plaintiff's administrative hearing before the ALJ occurred April 17, 2019. (ECF No. 16-2, PageID.1708–55.) At the time of his testimony, he was 57 years old, 5' 10", and 240 pounds. (*Id.* at PageID.1713.) The ALJ clarified that his questions, and Plaintiff's answers, should related to the period between 2007 and September 2016, given Plaintiff's favorable SSI determination from September 2016. (*Id.* at PageID.1713–14.) Plaintiff had a high school education. (*Id.* at PageID.1714.)

Plaintiff last worked in November 2007 as a machinist, prior to a motor vehicle accident. (*Id.* at PageID.1714–15.) Plaintiff believed that he could not return to that work. (*Id.* at PageID.1715.)

Plaintiff experienced some facial fractures where he stated his vision has not completely returned, but it had improved. (*Id.* at PageID.1718.) He had severe headaches, four to five times per week, for two to ten hours. (*Id.* at PageID.1718, 1721.) Plaintiff was prescribed Percocet for his headaches, and he denied any associated nausea or vomiting. (*Id.* at PageID.1721.) Plaintiff experienced back pain, and the pain averages 7/10, but it was two or three out of 10 with his medication. (*Id.* at PageID.1719.) Plaintiff's low-back pain could radiate down either leg on a weekly basis. (*Id.*) Plaintiff had a cervical fusion in 2003, but he indicated a strain that occurred above and below it. (*Id.* at PageID.1720.) Plaintiff experienced right knee pain, with average pain at about 6/10. (*Id.* at PageID.1722.) He had arthroscopic surgery, and his ACL and NCL were torn. (*Id.*) His knee swelled two or three times per week. (*Id.*) Plaintiff experienced difficulty sleeping because of pain; he was not taking medication for sleep because of side-effects. (*Id.* at PageID.1723.) Plaintiff experienced foot pain at about 7 or 8/10. (*Id.* at PageID.1724.) He had acid reflux about once every week or two weeks. (*Id.* at PageID.1725.)

Plaintiff stated he could walk for five to ten minutes, sit for 45 minutes with adjustments, and stand for 10–15 minutes. (*Id.* at PageID.1726–27.) He stated he could lift a maximum of 10 pounds. (*Id.* at PageID.1727.) He had difficulty climbing stairs. (*Id.*) He was okay with dexterity for, for example, buttoning clothes and picking up objects, but he occasionally had problems. (*Id.*) Plaintiff could not squat or bend well at the waist. (*Id.* at

PageID.1728.) Plaintiff did few chores or cooking. (*Id.*) Plaintiff received assistance with chores. (*Id.* at PageID.1729.) He also received assistance with shopping (*Id.*) Plaintiff claimed to have a mental impairment, such as PTSD. (*Id.* at PageID.1731–32.) He also claimed that his memory was not great, and that it was becoming worse. (*Id.* at PageID.1732.) Plaintiff's social events included visiting family. (*Id.* at PageID.1733–34.) He did not handle crowds well since the accident. (*Id.* at PageID.1734.)

Plaintiff stated he saw a chiropractor and his doctor for his headaches. (*Id.*) He also stated he would lay down three or four times per week because of the headaches. (*Id.* at PageID.1734–35.) The headaches impacted his ability to pay attention and concentrate. (*Id.* at PageID.1735.) Plaintiff had difficulty moving his head, from side to side or up and down, since his accident. (*Id.*) Plaintiff described how depression has impacted his life. (*Id.* at PageID.1735–36.) Plaintiff stated home therapy exercises provided not much benefit. (*Id.* at PageID.1736.) He believed, that with his foot problems, Plaintiff could not stand for six hours of the day. (*Id.*)

### c.   Medical Expert's Testimony at the Administrative Hearing.

Dr. Ronald Kendrick testified at the hearing. (*Id.* at PageID.1736–41.) The cited reason for the medical expert was the prior U.S. District Court judgment that the final decision in Plaintiff's case be reversed and remanded, in relevant part, to submit a 2010 MRI result to medical scrutiny. (*Id.* at PageID.1711.)

Dr. Kendrick testified on the MRI showing evidence of disc protrusion in Plaintiff's lower lumbar region that was described as mild to moderate pyramidal stenosis. (*Id.* at

PageID.1737.) Plaintiff had grade two spondylolisthesis of the L5 and S1. (*Id.*) CT scans of Plaintiff's dorsal spine showed degenerative disc disease. (*Id.* at PageID.1737–38.) Plaintiff had a previous fusion in the cervical spine. (*Id.* at PageID.1738.) Disc protrusions at the C3 and C4 levels did not seem to compromise any of the nerves. (*Id.*) Dr. Kendrick noted that there is no correlation between the findings of imaging studies and a Plaintiff's symptomology. (*Id.*) Dr. Kendrick considered the results of Plaintiff's cervical spine imaging studies to be a severe pathology, and for the mid-back and lumbar spine, to be moderate. (*Id.* at PageID.1739.)

> **d.    The Vocational Expert's ("VE") Testimony at the Administrative Hearing**

Plaintiff, through counsel, stipulated to Plaintiff's past relevant work being a machinist, SVP: 7, medium per *DOT*[4] and heavy as performed. (*Id.* at PageID.1712.) The ALJ inquired in the hypothetical, of a person with Plaintiff's age, education, and past work, with the limitations of "[being] capable of light exertion but the following limitations. There would be frequent balance, frequent rotation flexion of the neck, occasional climb ramps and stairs, occasional ladders, ropes and scaffolding. Occasional stoop, kneel, crouch and crawl." (*Id.* at PageID.1741.) The VE indicated that Plaintiff's past work would not be available. (*Id.*) Based on the VE's professional experience and the *DOT*, the VE identified jobs within the hypothetical as screwdriver operator, marker II, and small products assembler I. (*Id.* at PageID.1742.) The VE stated, with Plaintiff's skilled work experience, there were no transferable skills within the guidelines without significant

---

[4] *Dictionary of Occupational Titles*.

adjustment. (*Id.* at PageID.1742–43.) The VE also stated that, if Plaintiff was limited to simple routine tasks, that would not change the number of jobs. (*Id.* at PageID.1743.) The ALJ inquired about a sit-stand option with the same hypothetical, and the VE responded that the jobs would afford a sit-stand option, but the VE would reduce the available jobs by 75%. (*Id.*) The VE noted that off-task time of more than 15% of the workday would be work preclusive. (*Id.*)

Plaintiff's counsel inquired of the VE regarding the marker job being a light job, even though it would be at a manufacturing company; the VE said it was a light job. (*Id.* at PageID.1744.) The VE provided an example of where an individual was placed at a marker job six years earlier, and she described the characteristics of that marker job. (*Id.* at PageID.1744–45.) The VE provided an example of how a marker job would have a sit/stand option, with the provision of a stool for all employee workstations. (*Id.* at PageID.1745.) The VE indicated that his reduction, in the hypothetical, of 75% of the jobs if a sit/stand limit applied was based on the Occupational Employment Survey data and the VE's 27 years of professional experience. (*Id.* at PageID.1745–46.) The VE agreed that SVP and reasoning level were different, specifically that the SVP code indicated how long it would take someone to learn a job. (*Id.* at PageID.1747.)

As to the job numbers, the VE explained that there are a variety of sources used as they relate to the methodology used to calculate the number of jobs in response to hypotheticals. (*Id.* at PageID.1748–49.) Next, the VE indicated that while the *DOT* is outdated, nevertheless, based on her observations in the last seven years, those hypothetical jobs are still performed and performed according to the *DOT*. (*Id.* at PageID.1747–48.) The

VE also indicated that she has not placed anyone in the hypothetical's jobs in an area outside of Michigan, though the VE noted she has engaged in job placement for individuals through the whole state of Michigan. (*Id.* at PageID.1750–51.) Next, the VE indicated that the marker job or the assembly job were not tandem assembly; this means that they were not dependent on someone else's work coming down the assembly line. (*Id.* at PageID.1751.)

### F.   Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The regulations carve the evidence into categories: "acceptable medical sources" and "other sources." 20 C.F.R. §§ 404.1513 (amended March 27, 2017), 416.913 (amended March 27, 2017). "Acceptable medical sources" include, among others, licensed physicians and licensed or certified psychologists. *Id.* §§ 404.1513(a), 416.913(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* §§ 404.1513(d), 416.913(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006). Both acceptable and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* When acceptable medical sources issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. §§ 404.1527 (eff. Sept. 3, 2013 to

28

Mar. 26, 2017), 416.927 (eff. Aug. 24, 2012 to Mar. 26, 2017). Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* §§ 404.1527(d), 416.927(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. *Id.* §§ 404.1527(c) (eff. Sept. 3, 2013 to Mar. 26, 2017), 416.927(c) (eff. Aug. 24, 2012 to Mar. 26, 2017). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. §§ 404.1527(c), 416.927(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540–42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9, 2006).

Because Plaintiff filed his claim before March 27, 2017, he is entitled to the benefit of the treating-source rule. Under that rule, certain opinions of a treating physician receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. §§ 404.1527(d), 416.927(c)(2).

Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. §§ 404.1527(d), 416.927(d).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to a treating source's opinion in the written determination. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits must give specific reasons, supported by record evidence, for the weight granted to a treating source's opinion. *Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640–41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273 (Table), 1995 WL 138930, at *1 (6th Cir. 1995).

Plaintiff must provide evidence establishing her RFC. The statute lays the groundwork for this, stating, "An individual shall not be considered to be under a disability unless he [or she] furnishes such medical and other evidence of the existence thereof as the Secretary may require." 42 U.S.C. § 423(d)(5)(A); *see also Bowen*, 482 U.S. at 146 n.5. The RFC "is the most he [or she] can still do despite his [or her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. § 404.1545(a)(2).

According to SSR 16-3p, an ALJ must analyze the consistency of the Plaintiff's statements with the other record evidence, considering her testimony about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in the Social Security Ruling. SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016). This analysis and the conclusions drawn from it—formerly termed a credibility determination—can be

disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 981 (6th Cir. 2011); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004).

The Social Security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529(a) (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016). The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529 (2016); SSR 16-3p, 2016 WL 1119029, at *2 (March 16, 2016); *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 16-3p, 2016 WL 1119029, at *6 (March 16, 2016).

While "objective evidence of the pain itself" is not required, *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986) (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071) (3d Cir. 1984)) (internal quotation marks omitted), a claimant's description of his or her physical or mental impairments will "not alone establish that [he or she is] disabled." 20 C.F.R. § 404.1529(a). The absence of objective, confirming evidence obligates the ALJ to consider the following factors:

(i)     [D]aily activities;
(ii)    The location, duration, frequency, and intensity of . . . pain;
(iii)   Precipitating and aggravating factors;
(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)   Treatment, other than medication, . . . received for relief of . . . pain;

(vi)  Any measure . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3), 416.929(c)(3) (2016); *see also Felisky v. Bowen*, 35 F.3d 1027,

1039–40 (6th Cir. 1994); SSR 16-3p, 2016 WL 1119029, at *7 (March 16, 2016).

## G.   Arguments and Analysis

### 1.   ALJ's Evaluation of the Opinion Evidence

Plaintiff argues that the ALJ erred in evaluating the opinion evidence. Plaintiff is

incorrect. The opinion evidence will be taken in turn.

#### a.   Dr. Kendrick

Plaintiff argues that the ALJ incorrectly summarized the testimony of the medical

examiner, Dr. Kendrick, at the April 2019 hearing (ECF No. 16-2, PageID.1737–1740.)

Specifically, Plaintiff's issue here is that the ALJ did not inquire of the medical examiner

about the classification of Plaintiff's cervical spine, and that it is unclear about the extent

of the ALJ's application of medical examiner's moderate findings on the lumbar and

thoracic regions within the RFC. The purported error here is that, contrary to case law, the

ALJ substituted the physician's interpretation of the medical record for her own

interpretation. *See, e.g., Wyatt v. Comm'r of Soc. Sec.*, 2013 WL 4483074, at *16 (E.D.

Mich. 2013). Plaintiff overstates the record. The ALJ stated that Dr. Kendrick opined that

Plaintiff's "cervical impairment was adequately addressed with the successful fusion."

(ECF No. 15-21, PageID.1431). This parallels the statement from Dr. Kendrick, when he

spoke about Plaintiff's cervical region, that "anybody who has evidence of a disc disease

and has surgery, I think you would classify as severe pathology. . . . But the surgery . . .

32

seemed to have corrected his problem." (ECF No. 16-2, PageID.1739.) Dr. Kendrick also

stated, "I didn't notice that there was any worsening of the cervical spine." (*Id.* at

PageID.1738.) Thus, the ALJ did not err in restating the condition of Plaintiff's cervical

region. While the ALJ did not restate Dr. Kendrick's comment that "There's no correlation

between the findings and the symptomology" (*id.*), first, the ALJ is not required to address

every piece of evidence in her decision (*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x

496, 507–08 (6th Cir. 2006)), and second, Plaintiff does not identify the independent

significance of this comment relative to the ALJ's obligations under SSR 16-3p (evaluation

of symptoms in disability claims). In other words, the ALJ already has certain obligations

to consider the intensity and persistence of Plaintiff's symptoms, and Plaintiff does not

identify how the ALJ failed in her obligation by not explicitly restating Dr. Kendrick's

comment. Finally, Plaintiff argues the ALJ translated her lay opinion of what "moderate"

meant into the RFC. The error here, if there is any, is harmless, in light of the ALJ's

findings of severe impairments within the lumbar and thoracic spine at step two of the

sequential evaluation. Further, there is no direct indication of reliance on Dr. Kendrick's

opinion in crafting the RFC, and, again, a finding of a moderate pathology would seem to

be unfavorable to Plaintiff at step two and contrary to the ALJ's determination.

### b.    Dr. Stewart

In October 2011, Dr. Stewart opined that Plaintiff "would be unable to return to a

job as a machinist. He would require a job that would allow him to change position

frequently and he would be unlikely to tolerate a full 8 hours at work especially initially."

(ECF No. 15-16, PageID.1060.) The ALJ gave great weight to the opinion that Plaintiff

33

could not return to his past work; she gave little weight to the opinion that he would require a job that would allow frequent change of positions; and she gave no weight to the opinion that Plaintiff could not, initially, tolerate an eight-hour workday. (ECF No. 15-21, PageID.1435–36.) The ALJ's reasons for the given weights included that Dr. Stewart did not provide clinical signs or findings from the 2010 MRI results that support the vague functional limitation of frequent position change; further, Dr. Stewart's examination observations were not supportive of that functional limitation, and the opinion may be based on subjectively reported limitations; finally, the limitation that Plaintiff could not work an eight-hour workday is an issue reserved to the Commissioner.

Plaintiff alleged errors by the ALJ related to Dr. Stewart's opinions. Plaintiff focused on the record evidence that purports to be consistent with the above limitations of Dr. Stewart. Further, Plaintiff alleges the ALJ ignored record evidence of Plaintiff's neck pain status post cervical fusion. Plaintiff also tries to rebut the ALJ's stated reasons related to medical examination findings of no acute distress and possible influence of Plaintiff's subjective complaints.

In evaluating medical opinions in cases of claims filed before March 27, 2017, a treating source's medical opinion is given controlling weight if the opinion is well supported by clinical or laboratory diagnostic evidence and is not inconsistent with other substantial evidence in the medical record. 20 C.F.R. § 404.1527(c)(2). The ALJ is to give good reasons for the weight given to the treating source's opinion. *Id.*

As to Dr. Stewart, Plaintiff's citation of medical evidence that is contrary to the ALJ's findings is unavailing. Substantial evidence of an alternative conclusion in the record

is not sufficient to reverse an ALJ's decision. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001). Further, "the court will not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)).

The ALJ, in fact, considered the record evidence of Dr. Stewart's treatment notes from July 2010 to October 2011, and she appropriately summarized and considered Plaintiff's subjective complaints and objective examination results. Plaintiff, here, cannot show error by the ALJ for failure to consider record evidence. The Court will not reweigh this evidence considered by the ALJ. Similarly, Plaintiff asserts that the ALJ "simply ignores" evidence of the MRI impression of Plaintiff's neck pain status post cervical fusion with evidence of adjacent segment disease superior to the level of fusion. That is incorrect, for the same reason above—the ALJ considered the evidence within Dr. Stewart's treatment notes. Further, the citation of this evidence, in its isolation, provides no additional context of the nature and severity of Plaintiff's condition, given that the ALJ already found Plaintiff's cervicalgia to be a severe impairment.

Plaintiff's claims the ALJ erred with the weight given to Dr. Stewart because of the ALJ's references to the medical record of "no acute distress" and the ALJ's reference to Dr. Stewart being influenced by Plaintiff's subjective reports of limitations. Plaintiff cites to cases where an ALJ utilized their own interpretation of what "no acute distress" meant, and that was an error in the ALJ's duty to fully develop the record of this case. Contrary to Plaintiff's claim, it appears that the ALJ has satisfactorily fully developed the record in this case, both in terms of the weight given to Dr. Stewart's opinion and the RFC of Plaintiff.

The ALJ considered the no-acute-distress factor of the physical examination in combination with other consistent factors including Plaintiff's normal gait, comfortable appearance, his ability to transition from seated to standing, his intact muscle strength and no neurological deficits. Even assuming Plaintiff's definition of "no acute distress" is accurate, it is not clear what additional information would be elicited from further analysis.

The ALJ appropriately gave little weight to the Dr. Stewart's opinion that Plaintiff required a job that allowed frequent positional limitations. The work limitation in itself is not clear as to what is Plaintiff's physical limitation that the work limitation is in response to. Further, the proposed limitation appeared to be in response to Plaintiff's subjective complaints in October 2011 that he "cannot tolerate sitting for too long, standing for too long, walking for too long or repetitive bending and twisting." (ECF No. 15-16, PageID.1059.) A prior note from Dr. Stewart, in February 2011, recommended only conservative treatment in the form of an exercise program, a home remedy program, and medication. (*Id.* at PageID.1056.) Plaintiff, at that February time, indicated he had not seen the physical therapist yet, but has seen a chiropractor. (*Id.* at PageID.1055.) Plaintiff's pain was noted in his neck and thoracic area, and that he feels better sitting and not standing or walking. (*Id.*) Through Dr. Stewart's treatment notes, Plaintiff was clearly on a course of conservative treatment, but somehow quickly (and coincidently with his subjective complaints) was recommended to have significant work limitations. One would expect that if Plaintiff's circumstance were declining at this time, Plaintiff would have been recommended additional treatment as of February, after the findings of Plaintiff's 2010

MRI imaging analysis. The fact that Dr. Stewart did not, at the time, reflects an inconsistency between her opinion and her treatment record.

Overall, the ALJ properly gave little weight to Dr. Stewart's opinion because clinical findings did not support it. *See Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 652 (6th Cir. 2006).

Finally, whether or not Plaintiff can work is an issue reserved to the Commissioner. 20 C.F.R. § 1520b(c)(3); *Cosma v. Comm'r of Soc. Sec.*, 652 F. App'x 310, 311 (6th Cir. 2016) ("The ALJ reasonably gave no weight to Dr. Dhar's opinion because her conclusion that Cosma is totally disabled is a determination reserved to the Commissioner.")

### c.    Dr. Tim Strang

In July 2009, Tim Strang, Ph.D. (licensed psychologist) provided a consultative examination of Plaintiff. (ECF No. 15-9, PageID.516–20.) Dr. Strang's opinion was that Plaintiff's "injuries have been life-altering. He is currently unable to sit, stand, walk, or lay for any period of time without pain. It's going to be extremely difficult for him to maintain any type of employment at this time." (*Id.* at PageID.519.) The ALJ rejected these opinions because the conclusion whether Plaintiff can work is an issue reserved to the Commissioner, and there was no physical examination performed by Dr. Strang, and the assessment of Plaintiff's physical capabilities is outside of the expertise of Dr. Strang and was based on Plaintiff's subjective complaints.

Plaintiff asserts that pain is known to overlap with depression, which is treated by psychologists, and that the ALJ is incorrect to conclude that Dr. Strang's conclusion is outside of his expertise. However, the ALJ's conclusion was proper. *Rincon v. Comm'r of*

*Soc. Sec.*, No. 14-12098, 2016 WL 922945, at *3 (E.D. Mich. 2016) (holding that the ALJ properly gave little weight to an opinion from a consultative psychological examiner on the Plaintiff's physical limitations because they were outside the consultant's area of expertise). Plaintiff fails to connect his physical pain associated with sitting, standing, or walking with his psychological condition. Next, the matter that Plaintiff does not seem to exaggerate his condition, as noted by Dr. Strang, is irrelevant in its isolation to Plaintiff's case. The evaluation of pain in a disability case is based on well-known regulations and rulings (20 C.F.R. § 404.1529; SSR 16-3p) that provide direction to analyze the nature of the pain, which fundamentally requires the finding of a medically determinable impairment. Dr. Strang provides nothing (save for a visual observation of Plaintiff's outward appearance of pain when he sat or walked), and did nothing, to analyze the effects of Plaintiff's medically determinable physical impairments. Dr. Strang does not suggest that Plaintiff's inability to sit, stand, or walk without pain is due to a medically determinable mental impairment. So, it is reasonable to conclude that Dr. Strang's opinion was founded on Plaintiff's subjective complaints. *See Walton v. Comm'r of Soc. Sec.*, 60 F. App'x 603, 612 (6th Cir. 2003) (finding it reasonable to infer that an opinion was based on subjective complaints where it was not supported by relevant objective findings). Finally, Plaintiff's statements of alone do not provide a basis of a finding of disability. 20 C.F.R. § 404.1529(a).

### d.     Dr. Lazzara's opinion and remaining opinions.

Plaintiff asserts that the opinions of Drs. Steward, Shelle, Dewitt, and Scott were consistent with Dr. Strang, and further asserts that consistent opinions with the record are

afforded greater weight. Plaintiff misinterprets the regulation. Consistency is one factor in assessing the weight of medical opinions. The ALJ addressed the supportability of these opinions and gave them little weight. The collective little weight given to them is of no benefit to Plaintiff.

Plaintiff asserts that the ALJ ignored Dr. Lazzara's findings that Plaintiff had reduced Babinski sign in the lower extremities and that he had mild difficulty heel-and-toe walking. The ALJ is not required to articulate every piece of evidence. *Kornecky*, 167 F. App'x at 507–08. Nevertheless, Plaintiff does not explain the significance of these findings as to how they are inconsistent with the conclusions of Dr. Lazzara or the ALJ. Finally, Plaintiff argues that the ALJ's and Dr. Lazzara's finding that Plaintiff can lift less than 20 pounds is inconsistent with light work (which requires the ability to lift up to 20 pounds). Plaintiff's argument clearly focuses on the precise weight of 20 pounds and Plaintiff's capability of lifting it. The two bookends of limitations at issue here is Dr. Lazzara's limiting Plaintiff to lifting less than 20 pounds and the "light work" definition that light work involves lifting no more than 20 pounds; thus precisely 20 pounds fills the gap between the two limitations. To simply avoid the Plaintiff's picayune attempt at differentiating light and sedentary work, here, it is not controverted by Plaintiff or the ALJ that Plaintiff retains the ability to lift 19 pounds[5], which by definition puts him outside of sedentary work.

---

[5] "[T]he difference between 20 pounds and 'less than' 20 pounds is vanishingly thin" and that "the '<' symbol contains all numbers under 20; this includes everything from 1 pound to 19.99 pounds." *Gilliam v. Comm'r of Soc. Sec.*, 2019 WL 6112696, at *6 (E.D. Mich. 2019), *rep. & rec.* adopted, 2019 WL 4051746 (E.D. Mich. 2019).

Plaintiff asserts that the ALJ completely ignores Dr. Scott's opinion or a weight to be afforded to it. This is false. The ALJ analyzed Dr. Scott's opinion and gave it little weight. (ECF No. 15-21, PageID.1437.)

## 2.    ALJ's Subjective Symptom Analysis

Plaintiff argues that the ALJ's subjective symptom analysis contains legal error. Plaintiff is incorrect.

An ALJ is not required to accept a claimant's subjective symptom complaints and may properly discount the claimant's testimony about his symptoms when it is inconsistent with objective medical and other evidence. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475–76 (6th Cir. 2003); SSR 16-3p. Plaintiff's symptoms, including pain, will not be found to affect his ability to do basic work activities unless medical signs or laboratory findings show a medically determinable impairment is present. 20 C.F.R. § 404.1529(b). Plaintiff's record from medical sources will be considered, including factors such as Plaintiff's daily activities, aggravating factors of pain, the frequency and intensity of pain, and any efforts for treatment or for medication or for any measure used to alleviate pain. 20 C.F.R. § 404.1529(c)(3). Plaintiff's symptoms, including pain "will be determined to diminish [his] capacity for basic work activities to the extent that [his] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4).

In this case, the ALJ considered Plaintiff's symptoms relative to the medical evidence and other evidence of record. (ECF No. 15-21, PageID.1432.) The ALJ

considered Plaintiff's claim that he spends most of the days in a recliner, but no treatment provider noted any loss of muscle tone or any atrophy. (*Id.*) Plaintiff was generally found to be in no acute distress, despite his complaints of severe pain. (*Id.*) Similarly, Plaintiff's treatment records of physical examinations generally showed normal gait, intact motor strength, intact sensation, and no acute distress. (*Id.*) The ALJ noted findings of reduced range of motion and tenderness. (*Id.*) Plaintiff has a history of conservative treatment. (*Id.*) Finally, the ALJ reviewed Plaintiff's activities of daily living and depression, and, in light of other record evidence, determined that Plaintiff's symptoms are likely not as limiting as he claimed. (*Id.* at PageID.1433.)

Plaintiff claims that the ALJ made an independent medical judgment about the fact that a lack of muscle atrophy contradicts the Plaintiff's claim that he spends most days in a recliner. Plaintiff overstates the claim here, as the ALJ did not rely on her judgment alone but she was working from a reference to the medical record. (*See* ECF No. 15-21, PageID.1432. ("However, *treatment providers typically observed* normal muscle tone in all 4 extremities . . . ." (Emphasis added.))) *See also Vucinaj v. Comm'r of Soc. Sec.*, No. 18-12867, 2019 WL 2202889, at *7 (E.D. Mich. 2019).

Plaintiff claims the ALJ erred in the assessment that Plaintiff's cervical imaging remained stable, citing a finding of adjacent segment disease. Plaintiff overstates the record, in that the ALJ's assessment was commenting on the status of Plaintiff's cervical fusion surgery.

Plaintiff claims that his history of conservative treatment is undercut by his history of financial problems and the fact that his insurance coverage of his medical expenses had

ended. Plaintiff assumes, without stating, that he would have sought more aggressive medical treatment but for his loss in medical benefits. However, Plaintiff does not point to any medical record where this was a recommendation of a treatment provider or that Plaintiff himself desired more aggressive treatment. The ALJ noted Plaintiff's loss of benefits and the record that Dr. Stewart encouraged a home exercise period in the time when Plaintiff did not have medical benefits. A history of conservative treatment is generally inconsistent with subjective complaints of disabling pain. *See Ward v. Comm'r of Soc. Sec.*, 2019 WL 4891478, at *4 (E.D. Mich. 2019), *rep. & rec. adopted*, 2019 WL 4386070 (E.D. Mich. 2019).

Plaintiff claims that the ALJ's consideration of his activities of daily living do not support a determination that he is capable of light work, citing other record evidence of Plaintiff's limitations due to pain and citing cases where a plaintiff's limits were not fully described or where the ability to do simple functions do not indicate an ability to perform substantial gainful activity. Contrary to Plaintiff's assertion, the ALJ considered Plaintiff's claims about his time spent in a recliner, doing chores with the assistance of others, as well as living alone, driving, and managing funds. The ALJ indicated that these factors were not dispositive, alone, but were considered in light of other record medical evidence in this case. Where "the ALJ relie[s] on several items, such as the objective medical evidence . . . Plaintiff's daily activities, and Plaintiff's treatment, among other things, [the] consideration of Plaintiff's daily activities is not error." *Biestek v. Comm'r of Soc. Sec.*, 2017 WL 1214456, at *12 (E.D. Mich. 2017), *rep. & rec. adopted*, 2017 WL 1173775 (E.D. Mich. 2017).

Plaintiff claims that the ALJ erred in the analysis of his depression, finding that it was stable, and that Plaintiff was not hospitalized for that cause. Plaintiff points to the matter that his GAF score ranged from 45–50, indicative of a marked or serious impairment, and that he was in treatment at the time. The ALJ appropriately considered the records of Summit Pointe related to Plaintiff's mood, affect, thoughts, and behavior, and his mental capabilities, and the reports of improvement with medication treatment. Next, Plaintiff's GAF is not required to be considered "'when determining a [Plaintiff's] ability to work.'" *Harrell v. Comm'r of Soc. Sec.*, 2020 WL 435229 at *11 (E.D. Mich. 2020) (quoting *Shorkey v. Comm'r of Soc. Sec.*, 2014 WL 5361995, at *3 (E.D. Mich. 2014).

Plaintiff's argument about the definition of and the ALJ's use of stability is unavailing. Even assuming that it is true that one could be stable and disabled, the relevance and significance of that to Plaintiff's case is not clear. Plaintiff does not indicate any additional limitation needed within a mental RFC, does not address any evidence that the ALJ did not consider, nor rebut the findings of the weight given to Drs. Beshara, Wheeler, and Douglass. Finally, presumably, the ALJ's reference to Plaintiff's lack of hospitalization related to his mental condition is probative evidence of the nature and severity of his mental condition.

### 3.     ALJ's Step Five Determination

Plaintiff argues that the ALJ's step-five determination is flawed. Plaintiff is incorrect.

The ALJ provided for the limitation in Plaintiff's RFC that he be limited to simple and routine tasks. (ECF No. 15-21, PageID.1420.) The VE testified at the administrative

hearing that a limitation to simple, routine tasks would not change his responses as to the number of jobs provided; specifically, the VE stated "Those [jobs] are all SVP: 2 which would qualify as simple, routine in my opinion." (ECF No. 16-2, PageID.1743.)

Plaintiff argues that was an error in the VE's method of eliminating jobs that were detailed jobs (or alternatively stated, eliminating the jobs that were involve simple, routine tasks), in that the VE used the SVP code rather than reasoning level. Plaintiff misstates the responses from the VE. The VE responded that a sit/stand option would reduce the identified job numbers by 75%, and that limiting the hypothetical to simple, routine tasks would *not* change the number of jobs available. (*Id.*) Plaintiff next argues that the O*Net data (being the Occupational Employment Survey data) is out of date and that the hypothetical jobs that the VE identified do not exist. Plaintiff implies that O*Net was the VE's only source, but that is contrary to her stated testimony that she considered O*Net, the *DOT*, and her professional observation and experience. (ECF No. 16-2, PageID.1746.)

Finally, Plaintiff raises issues about the methodology of calculating the number of available jobs, about an assertion that all three jobs in the hypothetical are obsolete and do not exist, and claims an inference of one skilled job of a marker in Macomb, Michigan contradicts the categorization that a marker is an unskilled job. Contrary to these assertions, the ALJ analyzed each of Plaintiff's claims, and properly addressed the use of skill level and SVP, the VE's use of the *DOT* to establish an opinion of the hypothetical-jobs number in the national economy, the reliance on the vocational expert's testimony of her experience in job placement and of current job conditions, and the number of relevant and appropriate sources for the VE to consider. (ECF No. 15-21, PageID.1439–41); SSR 00-4p.

Clearly, Plaintiff's attempts to search for and find an alleged single job online does not comport with the requirements of step five of the sequential evaluation and thus does not contradict the ALJ's findings. Specifically, assuming that Plaintiff cannot do his past relevant work, the standard to apply is to see if Plaintiff's RFC allows him to do other work, considering his age, education, and work experience. 20 C.F.R. § 404.1560(b)(3),(c). "Any other work (jobs) that you can adjust to *must exist in significant numbers in the national economy* (either in the region where you live or in several regions in the country.)" *Id.* (emphasis added.) Further, it does not matter whether work exists in Plaintiff's area of residence or if a specific vacancy exists for him. 20 C.F.R. § 404.1566(a). Thus, Plaintiff's allegation that there is a single job available is irrelevant to the step five analysis.

Following proper step five analysis, the VE found three positions with 107,000 jobs in the national economy. In an earlier case, evidence of 6,000 jobs in the national economy was found to be significant. *See Taskila v. Comm'r of Soc. Sec.*, 819 F.3d 902, 905 (6th Cir. 2016).

### H.    Conclusion

For these reasons, and considering the absence of error, I would conclude that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's Motion, (ECF No. 19), **GRANTING** the Commissioner's motion, (ECF No. 21), and **AFFIRMING** the Commissioner's final decision denying benefits.

## III.   **REVIEW**

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days

after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2021                    S/ PATRICIA T. MORRIS
                                            Patricia T. Morris
                                            United States Magistrate Judge